ALAN D. GREENBERG
U.S. Department of Justice
Environmental Defense Section
999 18th Street, Suite 370
Denver, CO  80202
Phone: (303) 844-1366
FAX: 303-844-1350
Email:  alan.greenberg@usdoj.gov

JOHN M. NEWMAN
Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 8329
Missoula, MT 59807
101 E Front Street, Suite 401
Missoula, MT 59802
Phone: (406) 829-3336
Email: john.newman@usdoj.gov

*ATTORNEYS FOR DEFENDANT*
*UNITED STATES FOREST SERVICE*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE,<br><br>Defendant. | No. 9:22-CV-00168-DLC<br><br><br>DEFENDANT UNITED STATES FOREST SERVICE'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION .............................................................................1

BACKGROUND ...............................................................................4

    I.   Clean Water Act .....................................................................4

        A. Discharge of Pollutants ...............................................4

        B. Citizen Suits ................................................................6

    II.  Factual Background................................................................6

    III. Procedural Background .......................................................10

SUMMARY JUDGMENT STANDARD ...........................................10

ARGUMENT .................................................................................11

    I.   FSEEE Has Not Established Standing to Enforce Alleged Statutory Violations for Discharges to Waters of the United States Other than California's Sespe Creek.................................................................11

    II.  FSEEE Has Not Demonstrated Entitlement to a Prohibitory Injunction.....13

        A. The Forest Service's Acknowledgement of Fire Retardant Discharges to Sespe Creek or any other Waters Is Not Sufficient, by Itself, to Support the Overbroad Injunctive Relief FSEEE Seeks. ....................................13

        B. FSEEE Has Not Established a Prima Facie Case for the Injunctive Relief It Seeks. ................................................................................16

        C. FSEEE Has Not Established an Entitlement to a Nationwide Injunction.............................................................17

        D. Even if FSEEE Had Shown Potential Entitlement to an Injunction, Summary Judgment Should Be Denied Because the Nature and Scope of Appropriate Relief Turns on Genuinely Disputed Material Facts.........21

CONCLUSION ...............................................................................28

# TABLE OF AUTHORITIES

Cases

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970) ..................................................................................... 11, 17
*Bresgal v. Brock*,
   843 F.2d 1163 (9th Cir. 1987) ...........................................................................17
*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*,
   213 F.3d 474 (9th Cir. 2000) .............................................................................10
*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ...................................................................... 18, 20
*California v. Texas*,
   141 S. Ct. 2104 (2021) .......................................................................................18
*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ...........................................................................................10
*City and County of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ................................................................ 17, 18, 19
*Dep't of Homeland Sec. v. New York*,
   140 S. Ct. 599 (2020)..........................................................................................18
*E. Bay Sanctuary Covenant v. Barr*,
   934 F.3d 1026 (9th Cir. 2020) ...........................................................................19
*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)............................................................................................11
*Gill v. Whitford*,
   138 S. Ct. 1916 (2018).........................................................................................12
*Los Angeles Haven Hospice v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011) .............................................................................19
*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)............................................................................................11
*Monsanto Co. v. Geerston Seed Farms*,
   561 U.S. 139 (2010)............................................................................................15
*N. Cheyenne Tribe v. Norton*,
   503 F.3d 836 (9th Cir. 2007) .............................................................................15
*Price v. City of Stockton*,
   390 F.3d 1105 (9th Cir. 2004) ...........................................................................18
*Town of Chester v. v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017).................................................................................. 12, 21

*Wash. Env't Council v. Belin*,
  732 F.3d 1131 (9th Cir. 2013) ................................................................11
*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982).................................................................. 14, 15

Statutes

33 U.S.C. § 1311(a) ................................................................................. 6, 12
33 U.S.C. § 1311(b)(1)(C)............................................................................5
33 U.S.C. § 1342........................................................................................5
33 U.S.C. § 1342(a)(1)................................................................................5
33 U.S.C. § 1342(b)....................................................................................5
33 U.S.C. § 1342(b)(3)................................................................................5
33 U.S.C. § 1362(7)....................................................................................4
33 U.S.C. § 1362(12)..................................................................................4
33 U.S.C. § 1365(a)(1)................................................................................6
33 U.S.C. § 1365(f)....................................................................................6
33 U.S.C. § 1365(f)(1)........................................................................... 2, 12
33 U.S.C. § 1365(g)..................................................................................2, 6

Rules

Fed. R. Civ. P. 56(a)................................................................................10

Regulations

33 C.F.R. § 328.3(a)..................................................................................4
40 C.F.R. § 122.28....................................................................................6

Other Authorities

National Wild and Scenic Rivers System, *Sespe Creek, California*,
  https://www.rivers.gov/rivers/sespe.php (last visited Feb. 16, 2023) ...................12

## INTRODUCTION

The Forest Service cannot undertake its critically important firefighting activities while also guaranteeing that absolutely no aerial discharges of fire retardant will drop into waters.  The Forest Service aerially discharges fire retardant to protect human life, public safety, private property, and public lands and resources.  In rare cases, the aerial discharge of fire retardant drops into waters. From 2012 through 2019, less than one percent of retardant drops reached waters even in part.

The Forest Service has commenced the process to obtain Clean Water Act permits that will authorize the discharge of aerial fire retardant into waters, including entering a Federal Facilities Compliance Agreement with the United States Environmental Protection Agency ("EPA").  The process to obtain Federal, and as many as 47 State, Clean Water Act permits to cover future potential fire retardant discharges will likely take approximately two and a half years to complete.  Consequently, the Forest Service anticipates that it will have to discharge fire retardant to waters in limited circumstances until 2025 without a permit.  However, these potential future Clean Water Act violations do not themselves provide a basis for the finding of liability or the broad injunctive relief FSEEE seeks.

1

Notwithstanding the styling of its complaint, Forest Service Employees for Environmental Ethics' ("FSEEE") has not pleaded only a single claim alleging a particular "unlawful act," *i.e.*, a discharge without a permit, into specific waters. 33 U.S.C. § 1365(f)(1).  Rather, FSEEE alleges hundreds of discharges into waters in national forests nationwide.  To pursue relief pertaining to each of those discharges, FSEEE must establish that it "is or may be adversely affected" by, *id.* § 1365(g), and has Article III standing to enforce against, discharges in every water.  At summary judgment, FSEEE has not met its burden to show with specific, undisputed facts that the organization or its members suffer concrete and particularized injury from each of the myriad discharges challenged here.  FSEEE offered *no* specific evidence of injury to itself or its members at any location other than Sespe Creek in California's Los Padres National Forest.

The Forest Service does not dispute that discharges of fire retardant to Sespe Creek without a Clean Water Act permit are unlawful.  But FSEEE requests more than simply a declaratory judgment; it seeks a prohibitory injunction.

Before issuing an injunction addressing discharges to Sespe Creek or any other discharges for which this Court finds that FSEEE establishes standing, this Court must first balance any demonstrated hardships to FSEEE associated with the infrequent, unpermitted discharges of fire retardant to waters against the hardships to the Forest Service and public lands if the Forest Service cannot fight fires with

the aid of aerial discharges of retardant.  The Court must also evaluate the public interest in effectively fighting fires with retardant in this era of more frequent, more severe fires in the United States, even if occasional discharges into waters occur.

FSEEE's filings in support of its motion for summary judgment do not once mention the standard for obtaining a permanent injunction, much less meet FSEEE's burden of establishing all four elements of the injunction standard. Specifically, the aesthetic and recreational harm to one of FSEEE's members does not warrant an injunction against Forest Service discharges into Sespe Creek for firefighting purposes.  More broadly, FSEEE completely failed to show that the balance of hardships between FSEEE and the Forest Service supports the expansive prohibitory injunction that FSEEE seeks.  FSEEE ignored the need to drop fire retardant to protect public health and safety, to save lives or prevent injuries to firefighters.  FSEEE similarly completely failed to show that the public interest would not be disserved by its requested injunction.  This failure of FSEEE to proffer a prima facie case for a permanent injunction requires denial of its motion for summary judgment regarding injunctive relief in its entirety.

At minimum, FSEEE has failed to show that a nationwide injunction is necessary to provide relief for the limited injury it has shown.

In addition, genuine disputes as to facts material to the injunction FSEEE seeks preclude an award of summary judgment to FSEEE on remedy at this stage of the case.

Finally, the recently entered EPA Federal Facility Compliance Agreement places the Forest Service on a path to compliance with the Clean Water Act. The Court should not award FSEEE any injunction on summary judgment.

<div align="center">

**BACKGROUND**

</div>

I.     **Clean Water Act**

     **A. Discharge of Pollutants**

The Clean Water Act provides that "the discharge of any pollutant by any person shall be unlawful" except in compliance with the Act's terms. 33 U.S.C. § 1311(a).

The Clean Water Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source . . . ." 33 U.S.C. § 1362(12). Navigable waters are defined as "waters of the United States" and include, in addition to traditionally navigable waters, certain tributaries that flow directly or indirectly into navigable waters and certain wetlands adjacent to navigable waters and their tributaries. 33 U.S.C. § 1362(7); 33 C.F.R. § 328.3(a).

The primary way that a person may discharge a pollutant without violating the Clean Water Act's prohibition is to obtain a permit pursuant to Clean Water

<div align="center">4</div>

Act Section 402, 33 U.S.C. § 1342.  In Section 402, Congress established the

Clean Water Act's National Pollutant Discharge Elimination System ("NPDES").

Under Section 402(a), EPA "may, after opportunity for public hearing issue a

permit for the discharge of any pollutant, or combination of pollutants,

notwithstanding section 1311(a)" upon meeting certain conditions required by the

Act.  33 U.S.C. § 1342(a)(1).

Congress authorized EPA to approve qualifying applications from States to

administer NPDES permitting programs for discharges into waters within their

jurisdiction.  33 U.S.C. § 1342(b).  In accordance with that provision, EPA has

approved 47 States, including California, and the U.S. Virgin Islands to administer

the NPDES permit programs under state or territorial law.  Declaration of

Christopher Kloss, Exhibit A, ¶ 4.  In the handful of remaining States and

Territories and in Indian country, EPA administers the NPDES program.  *Id.* ¶ 3.

EPA is also the permitting authority for discharges on Federal lands in Colorado,

Delaware, Vermont, and Washington states.  *Id.*  NPDES permits must contain

technology-based limits (which EPA can standardize through rulemaking) and

"any more stringent limitation, including those necessary to meet water quality

standards."  33 U.S.C. § 1311(b)(1)(C).  The permitting agency must publish

notice of the draft permit and solicit and respond to public comments before

issuing a final NPDES permit.  33 U.S.C. § 1342(b)(3).

Where a large number of similarly situated discharges exist, EPA and States may issue general permits covering a category of dischargers in lieu of issuing individual permits to each discharger.  *See* 40 C.F.R. § 122.28.

## B. Citizen Suits

A person with "an interest which is or may be adversely affected," 33 U.S.C. § 1365(g), may sue another person—including the United States and its agencies—that is "alleged to be in violation of . . . an effluent standard or limitation under [the Act]."  *Id.* § 1365(a)(1).  As relevant here, the term "effluent standard or limitation" includes "an unlawful act under [33 U.S.C. § 1311(a)]," the foundational provision of the Act that prohibits discharge of a pollutant into waters of the United States without a permit.  33 U.S.C. § 1365(f).

## II.   Factual Background

Aerial application of fire retardant is part of the Forest Service's integrated firefighting strategy.  Declaration of Alex Robertson, Exhibit B, ¶¶ 4–16.  Fire retardant is applied aerially in a range of situations depending on access, topography, fuel condition, available resources, time of year, expected weather, and other factors.  *Id.*  ¶ 8.  High fire intensity and fires that spread rapidly inhibit the Forest Service's ability to fight wildland fires safely with ground-based forces alone.  *Id.* ¶ 4.  In addition, remote locations and rugged topography that make access difficult will often delay the deployment of ground forces for fire

6

suppression efforts and necessitate the use of aerial application of fire retardant.
*Id.* ¶ 8. Fire retardant is intended to slow the rate of fire spread by cooling and coating fuels, depleting the fire of oxygen, and slowing the rate of fuel combustion as the retardant's inorganic salts change how fuels burn. *Id.* ¶ 7. Fire retardant generally slows the rate of fire spread and its intensity but typically does not put the fire out. *Id.* ¶ 5.

In October 2011, the Forest Service completed an Environmental Impact Statement ("EIS") to assess the environmental and economic impacts of nationwide aerial application of fire retardant on national forest system land. Doc. 8-1. The Forest Service prepared the EIS to "address the need for the continued use of aerially applied fire retardant as a firefighting tool because it reduces fire intensities and rates of spread and increases the ability to safely fight wildland fires with ground-based forces." *Id.* at 14 of 562. The Forest Service balanced the need to protect critical or sensitive resources with the need to use fire retardant as an effective firefighting tool to protect life and property from wildfire. *Id.*

In December 2011, the Forest Service issued its Record of Decision for the nationwide application of fire retardant. Declaration of Jerome E. Perez, Exhibit C, ¶ 14; *see* Doc. 8-2. The Record of Decision approved the use of aerially applied fire retardant and implemented an adaptive management approach designed to protect resources and continue to improve the documentation of retardant effects

7

through reporting, monitoring, and application coordination.  Perez Decl. ¶ 14;

Doc. 8-2 at 8–9 of 74.  The Record of Decision does not allow the use of aerial fire

retardant in designated avoidance areas for threatened and endangered species or in

waterways.[1]  Perez Decl. ¶ 14.  Aerial application of fire retardant is also to be

avoided within 300-foot buffers adjacent to waterways.  Perez Decl. ¶ 15.  This

directive must be implemented except in cases where human life or public safety is

threatened and retardant use within avoidance areas could be reasonably expected

to alleviate that threat.  *Id.* ¶ 14.

In accordance with the Record of Decision, the Forest Service has monitored

and reported the use of fire retardant since 2012.  Declaration of Laura Conway,

Exhibit D, ¶ 4.  During the years 2012 through 2019, the Forest Service aerially

dropped approximately 102,362,031 gallons of fire retardant on National Forest

System lands.  *Id.*  Using an average of 1,800 gallons per drop, this is estimated to

be 56,868 drops.  *Id.*  During the same period, 457 intrusions into avoidance areas

were reported on National Forest System lands.  *Id.* ¶ 8.  Of those, 213 intrusions

---

[1]     The Forest Service's use of the terms "waterways" or "waters" in the context
of aerial discharges of retardant is not the same as the definition of "waters of the
United States" that are regulated under the Clean Water Act.  *See* Perez Decl., Ex.
C, ¶ 15 (identifying waterways for purposes of fire-retardant policy as including
perennial streams, intermittent streams, lakes, ponds, identified springs, reservoirs,
and vernal pools); Conway Decl., Ex. D, ¶ 6.  As a result, not all identified drops of
retardants may constitute a discharge of a pollutant into waters of the United States
regulated under the Clean Water Act, or thereby amount to a Clean Water Act
violation.

landed partially in water, either in accordance with the exception to protect human life or public safety (23 intrusions) or due to accident (190 intrusions). *Id.* Thus, for the approximately 56,868 drops, and assuming an average drop is 1,800 gallons, there was one intrusion partially into water for every 267 drops made during that time. *Id.* This amounts to less than one percent of drops.[2] The only way to prevent entirely accidental discharges of retardants to waters is to prohibit their use entirely. Perez Decl., Ex. C, ¶ 17.

On February 16, 2023, the Forest Service and EPA entered into a Federal Facility Compliance Agreement. *Id.* ¶ 22, and Attachment C-1. The purpose of this Compliance Agreement is to address the Forest Service's discharge of pollutants during aerial fire retardant applications and to require the Forest Service to obtain NPDES permit coverage for discharges to waters. *Id.*, Attachment C-1 at 1. The ultimate objective of the obligations in the Compliance Agreement is to cause the Forest Service to come into and remain in full compliance with all applicable Federal, state, and local laws governing the discharge of pollutants into waters of the United States. *Id.* Among other provisions, the Compliance

---

[2]     An intrusion can consist of more than one drop at a given site. Doc. 8-4 at 83 of 171 nn.5, 6. The data presented in Appendix D to the draft Supplemental EIS for 2012–2019 shows that, on average, an intrusion includes less than two drops. *Id.* at 94 of 171 (459 intrusion reports identifying 853 drops). Even assuming an average of two drops per intrusion during this period, two drops partially into water for every 267 drops is 0.74 percent of retardant drops.

Agreement requires the Forest Service to use aerially-delivered fire retardant according to the direction in the 2011 Record of Decision until the Forest Service obtains NPDES permit coverage. *Id.* at 5.

## III.  Procedural Background

FSEEE's complaint invokes only the Clean Water Act's citizen suit provision. Doc. 1, ¶ 4. FSEEE filed one declaration, on December 8, 2022, seeking to show that it has one member adversely affected by Forest Service discharges of fire retardant to Sespe Creek, in California. Doc. 4. Although the complaint references several actions taken by the Forest Service relating to aerial fire retardant, FSEEE does not challenge or seek to compel "agency action" within the meaning of the Administrative Procedure Act. *See* Doc. 1.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. When the moving party bears the burden of proof, it must come forward with evidence that would entitle it to a directed verdict if the evidence were uncontroverted at trial. *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.,* 213

10

F.3d 474, 480 (9th Cir. 2000).  If the moving party fails to meet its initial burden,

"summary judgment *must be denied* even if no opposing evidentiary matter is

presented."  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970) (internal

quotation marks omitted) (emphasis added).

## ARGUMENT

I.    **FSEEE Has Not Established Standing to Enforce Alleged Statutory Violations for Discharges to Waters of the United States Other than California's Sespe Creek.**

A federal court may entertain a suit only by a plaintiff who establishes

Article III standing, including the foremost requirement of injury in fact.  As

articulated by the Supreme Court, "environmental plaintiffs adequately allege

injury in fact when they aver that they use the affected area and are persons 'for

whom the aesthetic and recreational values of the area *will be lessened*' by the

challenged activity."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC),*

*Inc.*, 528 U.S. 167, 183 (2000), (emphasis added).  At the summary judgment

stage, a plaintiff must "set forth by affidavit or other evidence *specific facts*, which

for purposes of the summary judgment motion will be taken to be true."  *Wash.*

*Env't Council v. Belin*, 732 F.3d 1131, 1139 (9th Cir. 2013) (quoting *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (emphasis added).  "A plaintiff's

basis for standing must affirmatively appear in the record."  *Id.*

A plaintiff must establish standing for each claim asserted. *See Town of Chester v. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). Under the Clean Water Act's citizen suit provision, each alleged "unlawful act" under 33 U.S.C. § 1311(a)—discharging a pollutant to waters of the United States without a permit—gives rise to a distinct claim. *See* 33 U.S.C. § 1365(f)(1). Consequently, standing to sue based on discharges into one water does not provide standing to sue based on discharges into any other waters.

FSEEE submitted only one declaration in support of its standing. One of FSEEE's members, Mr. Peter Deneen, asserts that discharges of fire retardant to Sespe Creek near Ojai, California, harmed his use and enjoyment of Sespe Creek.[3] Doc. 4 at ¶¶ 6–7. This is the only evidence presented setting forth specific facts relating injury attributable to a discharge of fire retardant to a specific water body—or even a specific national forest (in this case, Los Padres National Forest). The geographic scope of the injury to FSEEE established by the evidence presented does not extend beyond Sespe Creek in California.

FSEEE does not demonstrate the requisite "concrete and particularized" injury in fact, *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (citation omitted), to

---

[3]     Mr. Deneen refers to the waterbody as the Sespe River, but its correct name is Sespe Creek. National Wild and Scenic Rivers System, *Sespe Creek, California*, https://www.rivers.gov/rivers/sespe.php (last visited Feb. 16, 2023).

establish standing under Article III to enforce alleged violations of the Clean Water Act at the thousands of other waters in the many national forest units in this country that in the past were or may in the future be subject to fire retardant drops. The Court therefore cannot grant FSEEE summary judgment or award any relief— declaratory or otherwise—with regard to Forest Service discharges in any waters of the United States other than Sespe Creek (or, at most, Los Padres National Forest).

## II.    FSEEE Has Not Demonstrated Entitlement to a Prohibitory Injunction.

### A. The Forest Service's Acknowledgement of Fire Retardant Discharges to Sespe Creek or any other Waters Is Not Sufficient, by Itself, to Support the Overbroad Injunctive Relief FSEEE Seeks.

The Forest Service has in the past discharged fire retardant from aircraft into waters of the United States without a Clean Water Act permit in certain limited circumstances.  The Forest Service has intentionally dropped retardant into water where public health and safety require its use to prevent the loss of life or injury to firefighters or members of the public.  The Forest Service has also unintentionally dropped retardant into water.  The Forest Service will likely continue to discharge fire retardant into waters without a permit in these limited circumstances during the next couple of years.  Nonetheless, these facts alone do not support the imposition of an injunction prohibiting the Forest Service from discharging fire retardant into waters of the United States without a permit.  This Court must weigh the traditional

factors for issuance of a permanent injunction, including balancing the hardship to FSEEE and to the Forest Service and assessing the public interest.

The Supreme Court held, in *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), that the Clean Water Act does not require a district court to enjoin all discharges of pollutants that fail to comply with the Act's permit requirements. In *Romero-Barcelo*, the plaintiffs enforced against the Navy's discharge of ordnance into waters near Puerto Rico without a Clean Water Act permit. *Id.* at 307–08. The district court found the Navy liable and ordered the Navy to obtain a permit, but it did not enjoin military operations pending consideration of the permit application. *Id.* at 309–10. The court of appeals reversed and instructed the district court to order the Navy to cease the violation until it obtained a permit. *Id.* at 310.

The Supreme Court overturned the decision of the court of appeals. It concluded that the Clean Water Act does not foreclose the exercise of a district court's discretion to fashion an equitable remedy to address violations of the Clean Water Act arising from discharges without a permit. *Id.* at 320. In exercising its discretion, courts should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Id.* at 312. The Court determined that the Clean Water Act's statutory scheme as a whole suggests that Congress did not intend to deny courts their traditional equitable discretion to

14

balance the equities and fashion remedies other than an immediate prohibitory injunction. *Id.* at 316. Therefore, the Supreme Court reversed the court of appeals and remanded the case so that the district court could employ its traditional equitable discretion to fashion a remedy designed to secure prompt compliance with the Clean Water Act. *Id.* at 320.

For these reasons, this Court must apply the traditional equitable four-factor test associated with the issuance of a permanent injunction. *See Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 156–57 (2010). Permanent injunctive relief is appropriate when the party seeking the injunction demonstrates:

(1) that it has suffered an irreparable injury;

(2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;

(3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

(4) that the public interest would not be disserved by a permanent injunction.

*Id.; N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007). When assessing appropriate permanent injunctive relief, "the court must balance the equities between the parties and give due regard to the public interest." *N. Cheyenne,* 503 F.3d at 843. Evidence of discharges alone is not sufficient to support the requested injunction.

### B. FSEEE Has Not Established a Prima Facie Case for the Injunctive Relief It Seeks.

FSEEE's motion and supporting materials do not explicitly address any of the four elements on which it has the burden of production and persuasion to obtain a permanent injunction.  Because FSEEE does not meet its burden of proof, the Court must deny FSEEE's motion for summary judgment for this reason alone.

As discussed above, *supra* at 12, the only injury FSEEE supports with evidence is one member's harm associated with discharges of fire retardant into Sespe Creek.  But FSEEE does not argue that this injury was irreparable or that remedies at law are inadequate to meet the first two requirements of the injunction standard.

Neither of the two arguments FSEEE makes in support of its request for a prohibitory injunction is legally sufficient to enjoin application of fire retardants to waters of the United States.  First, FSEEE argues that the Forest Service's past discharges of fire retardant into waters together with its intention to continue discharges in certain limited circumstances until a permit is issued requires issuance of an injunction.  FSEEE Brief, Doc. 7, at 7–8.  However, as explained above, *supra* at 14-15, the Supreme Court has established that the traditional four-factor test applies, as the Clean Water Act does not require a district court to enjoin discharges of fire retardant that do not comply with the Act's permit requirements.

Second, FSEEE presents cursory evidence of harm to aquatic species

16

attributable to fire retardant entering a waterway.  FSEEE Brief at 8.  However,

FSEEE makes no attempt to balance any hardship to FSEEE against the obvious

and severe hardship to the Forest Service and the public lands it manages if the

Court were to issue FSEEE's desired injunction.  Remarkably, FSEEE does not

even mention the public interest in its argument for an injunction that would

seriously impact the manner the Forest Service fights the more frequent and

intense fires occurring on the public lands primarily in the Western United States.

*See* Perez Decl., Ex. C, ¶¶ 6, 7, 8 (discussing the increase in the number, size and

damage of wildfires).

Because FSEEE bears the burden of establishing each element necessary to

support issuance of a prohibitory injunction and it has not met its initial burden, the

Court must deny summary judgment on FSEEE's requested injunction.  *Adickes*,

398 U.S. at 160.

### C. FSEEE Has Not Established an Entitlement to a Nationwide Injunction.

An injunction must be "narrowly tailored to remedy the specific harm

shown."  *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1244–45

(9th Cir. 2018) (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987)).

Here, FSEEE submitted evidence of harm only as to one of its members, who

identifies the discharge of fire retardant to one water body in California that

allegedly caused him harm.  In the context of this citizen suit in which the plaintiff

must allege specific unlawful discharges,[4] this evidence is insufficient to support any relief, much less an injunction that would bar the discharge of fire retardant by the Forest Service to waters in all national forests throughout the country.

Remedies operate with respect to specific parties. *California v. Texas*, 141 S. Ct. 2104, 2115 (2021). Beyond examining the merits of a party's arguments, this Court must separately analyze whether nationwide relief is "*necessary* to give prevailing parties the relief to which they are entitled" before issuing such an injunction. *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018); *cf. Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J. concurring) ("Universal injunctions have little basis in traditional equitable practice."). An injunction must be no broader and no more burdensome to the defendant than necessary. *City and County of San Francisco*, 897 F.3d at 1244-45. If awarded at all, an injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiff, rather than 'to enjoin all possible breaches of the law.'" *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (internal quotations omitted).

The party seeking an injunction must *present evidence* that is sufficient to support the scope of the desired injunction. In *City and County of San Francisco*,

---

[4]   FSEEE is not asserting a claim under the Administrative Procedure Act that challenges a final agency action. Doc. 1. The only claim for relief in the complaint is an enforcement claim involving an alleged statutory violation involving unpermitted discharges of a pollutant.

18

the Ninth Circuit reviewed a nationwide injunction issued by a district court that barred enforcement of an Executive Order preventing "sanctuary jurisdictions" from receiving federal grants.  897 F.3d at 1231.  The court of appeals observed that the tendered evidence in support of injunctive relief was limited to the effect of the Executive Order on the State of California and two counties within the State.  *Id.* at 1244.  Consequently, the court vacated the injunction to the extent it applied outside California and remanded to the district court for further consideration of whether a nationwide injunction was justified.  *Id.* at 1245; *see also E. Bay Sanctuary Covenant v. Barr,* 934 F.3d 1026, 1029, 1031 (9th Cir. 2020) (vacating nationwide injunction because the limited record did not justify it); *Los Angeles Haven Hospice v. Sebelius*, 638 F.3d 644, 665 (9th Cir. 2011) (vacating nationwide injunction and remanding for entry of injunction that is no broader and no more burdensome than necessary to provide complete relief to the plaintiff).

The evidentiary record submitted by FSEEE is not sufficient to support the overbroad prohibitory injunction it seeks.  FSEEE seeks to "enjoin aerial application of retardants into [waters] unless and until the Forest Service has a legal NPDES permit to do so."  FSEEE Brief at 9.  As discussed, FSEEE presented evidence of harm only from discharges of fire retardant to Sespe Creek.  The geographic scope of the harm established by the evidentiary record in this case

does not extend beyond one creek in southern California.  And those allegations—

which are neither balanced against the public interest in wildfire management nor

measured against the legal standard for "irreparable harm"—are insufficient

grounds for an injunction to Sespe Creek itself, to say nothing of the national

injunction FSEEE seeks.[5]

Another reason why the Court should not enter a nationwide or other broad

injunction in the context of fire retardant discharges is that the balance of

hardships and public interest implicate many parties and their interests that are not

before this Court.  For example, some water bodies may be adjacent to human

development or valued non-aquatic resources, such as a stand of old-growth

redwood trees, where greater hardships arise from a prohibition on use of aerially

discharged fire retardant.  Nationwide injunctions are discouraged when they

preclude citizens in other geographic locations from litigating the balance of

hardships and the public interest associated with the use of fire retardant.  *See*

*Azar*, 911 F.3d at 583–84.  That would be the case here, where the requested

nationwide injunction could seriously affect parties not presently before this Court

and their equities.

---

[5]    Indeed, FSEEE offered no evidence that it is harmed by any Forest Service activities in Montana.

In addition to presenting evidence to support the broad geographic scope of the injunction FSEEE seeks, FSEEE must also present evidence that it has standing to obtain this remedy.  The plaintiff must demonstrate Article III standing "for each form of relief that is sought."  *Town of Chester*, 137 S. Ct. at 1650.

As discussed above, FSEEE presented evidence of harm only from discharges of fire retardant to the Sespe Creek.  FSEEE did not demonstrate the requisite concrete and particularized injury to establish standing for a nationwide injunction.

### D. Even if FSEEE Had Shown Potential Entitlement to an Injunction, Summary Judgment Should Be Denied Because the Nature and Scope of Appropriate Relief Turns on Genuinely Disputed Material Facts.

FSEEE, like the plaintiffs in *Barcelo-Romero*, seeks an order that enjoins discharges into waters of the United States prior to obtaining a NPDES permit.  In this case, FSEEE goes even further because the requested injunction would apply without geographic limitation.  The Forest Service disputes FSEEE's apparent position that the balance of hardships supports the injunction FSEEE seeks.  The Forest Service also disputes that the public interest favors an injunction.  The parties' dispute over facts material to the injunction that FSEEE seeks precludes entry of summary judgment at this stage, under well-settled rules applicable to resolving claims on summary judgment.

Initially, the Forest Service disputes FSEEE's proposal to tie the duration of

21

the prohibition on discharge of fire retardant to waters to the ability of the Forest Service to obtain individual or general NPDES permits.  This proposal ignores the real world, practical aspects of obtaining Clean Water Act permits for the discharge of fire retardant.  The Forest Service cannot obtain individual NPDES permit coverage for the discharge of fire retardant to waters because the Forest Service does not have sufficient advance notice of its need for each discharge of fire retardant.  Perez Decl, Ex. C, ¶ 21; Kloss Decl., Ex. A, ¶ 6.  The Forest Service cannot know in advance when it will be required to discharge fire retardant into waters, the location of the receiving waters, the quantity to be discharged into waters, any threatened or endangered species present, and similar facts required to apply for an individual permit.  Perez Decl, Ex. C, ¶ 21.  Moreover, by the time any individual permit would be drafted, public comment solicited, and a final permit issued, the need for the discharge of retardant into the specifically identified waters will almost certainly have passed.  *Id.*

For this reason, the Forest Service will need to obtain a general NPDES permit from EPA and the 47 States authorized to implement the NPDES program in its jurisdiction.  In January 2023, the Forest Service requested that EPA develop a general permit for the discharge of fire retardant into waters of the United States.  Perez Decl., Ex. C, ¶ 20.  EPA intends to propose such a general permit.  Kloss Decl., Ex. A, ¶ 6.

22

The issuance of an EPA general permit will likely require approximately two and a half years. *Id.* ¶¶ 14, 35. The development of a general permit for fire retardant discharges will require the acquisition of significant information regarding fire retardant, its uses, existing practices, and its impacts to waters. *Id.* ¶ 15. EPA must identify the types of retardants and applications that require permit coverage, and it must develop permit conditions, including effluent limitations, sufficient to meet Clean Water Act requirements. *Id.* ¶¶ 17–20. EPA must give public notice of a draft general permit, provide an opportunity for public comment, and respond to those public comments prior to issuing the permit. *Id.* ¶¶ 24–25. EPA must consult with outside parties to develop permit conditions that meet several state, tribal, and federal requirements, including the Endangered Species Act, the Coastal Zone Management Act, and the National Historic Preservation Act. *Id.* ¶¶ 29–32, 34. EPA also plans to work with nonfederal permitting authorities to assist them in developing their own NPDES general permits. *Id.* ¶¶ 8, 35. EPA estimates that this administrative process—involving development, proposal, and issuance of general permits—will take approximately two and a half years, and is dependent on timely actions by outside parties.[6] *Id.* ¶¶ 14, 35.

---

[6] Because EPA will be the lead agency on developing a general permit, an EPA employee provided a declaration to describe the anticipated process. FSEEE has not brought any claim against EPA and has not sought relief against EPA, and no subject matter jurisdiction exists to order any relief against EPA in this case.

The Forest Service also disputes FSEEE's implicit factual position that any hardship to the Forest Service or public lands during the years prior to issuance of NPDES permits is outweighed by the potential harm to aquatic species.  Twenty-three intrusions of fire retardant into waters from 2012 to 2019 occurred only after the Forest Service determined that human life or public safety was threatened and retardant use could reasonably be expected to help alleviate those serious threats. Conway Decl., Ex. D, ¶ 8.  In some of the situations, Forest Service discharged fire retardant into waters to alleviate threats to human life, including firefighters. Declaration of Brian D. Sexton, Exhibit E, ¶ 5; Robertson Decl., Ex. B, ¶ 14.  This evidence presented by the Forest Service raises genuine disputes regarding whether the hardship of a prohibition on the discharge of fire retardant to waters to fight fires to protect human life or public safety is outweighed by potential harm to aquatic species by the limited discharge of fire retardant to waters.

The Howard fire, which resulted in the discharges of fire retardant to Sespe Creek identified in Mr. Deneen's declaration, illustrates the disputes regarding the balance of hardships.  Some of the discharges of fire retardant to waters at the Howard fire were authorized under the exception for protecting human life and public safety.  Sexton Decl., Ex. E, ¶ 5.  When the fire started, seven hikers were in the national forest in the Sespe Creek drainage and were in danger.  *Id.*  A helicopter diverted from a water dropping assignment to rescue the hikers.  *Id.*  The

24

Forest Service directed air tankers to drop retardant directly on the fire edge on the left flank of the fire to create a buffer between the hikers and the fire. *Id.* The direct attack with the retardant took the retardant line into Sespe Creek. *Id.* The use of fire retardant in this situation had a direct impact on the successful evacuation of the hikers. *Id.*

A prohibition on accidental discharges of retardant to waters will also impair firefighting capabilities. The only way to prevent entirely accidental discharges of retardant to waters is to prohibit its use entirely. Perez Decl., Ex. C, ¶ 17. Waters of the United States are found in every National Forest. Although the Forest Service makes best efforts to avoid discharges to those waters, *see* Robertson Decl., Ex. B, ¶ 13, accidents happen. The Forest Service disputes, as a matter of fact, that the balance of hardships favors a prohibition on accidental discharges of fire retardant to waters, where such a prohibition likely would be tantamount to a complete ban of aerial discharges of retardant. Perez Decl., Ex. C, ¶ 17.

The Forest Service also disputes FSEEE's implicit contention that the discharges of fire retardant at issue are not in the public interest. Discharges of fire retardant into waters occur as a consequence of the Forest Service's efforts to fight fires that can endanger human life and safety; can destroy private property, including homes and businesses; and can impact public lands, terrestrial animals, and other natural resources. *Id.* ¶¶ 3, 17. These efforts further the public interest.

25

The protection of aquatic species is also in the public interest and the Forest Service strives to protect aquatic resources through implementation of the 2011 Record of Decision.  Conway Decl., Ex. D, ¶ 10.  But a prohibition on the use of fire retardant may not in every case favor the public interest in protecting these species.

FSEEE's requested injunction would improperly resolve these issues of fact in a "one size fits all" manner and would disregard the facts and circumstances of each discharge.  For example, absent an aerial discharge of fire retardant, an uncontrolled wildfire can adversely impact the habitat of aquatic species and cause harm.  *See* Conway Decl., Ex. D, ¶ 16.  The Forest Service's analysis of comparative risks of uncontrolled wildfires and the use of retardants found that the immediate effects of uncontrolled wildfire included increased water temperature, altered water chemistry, and increased sediment suspension.  *Id.* ¶ 16.  The Forest Service's evidence addressing the public interest raises genuine disputes as to material facts regarding the set of comparative risks and benefits of each application of retardant.

The Forest Service also disputes as a factual matter the only quantitative evidence FSEEE cites to establish harm to aquatic species.  FSEEE asserts that there were "138 intrusions into threatened or endangered species habitat that required consultation for [National Oceanic and Atmospheric Administration]

species." FSEEE Brief at 8. However, the 138 figure represents the total "number of fires with intrusions" for the years 2012–2019 on Forest Service units that have species under the jurisdiction of NOAA Fisheries. Doc. 8-7 at 111 of 212. The 138 identified fires with intrusions are a much broader category than the much smaller number of discharges to *waters* that could affect aquatic species in NOAA fisheries. There were only 24 intrusions into aquatic habitat of NOAA Fisheries managed species. Conway Decl., Ex. D, ¶ 9. Therefore, during the 2012–19 period, intrusions that potentially could have adversely affected NOAA Fisheries managed species averaged *three* per year, not the 17 per year calculated by FSEEE. *See* FSEEE Brief at 8.

In addition, the Forest Service disputes the extent and likelihood of adverse effects to aquatic species attributable to discharged fire retardant. Recent studies show that intrusions may have an adverse effect on aquatic species, lethal intrusions of retardant are expected to be extremely rare, and the majority of effects, if they occur, are assumed to be sub-lethal or indirect. Conway Decl., Ex. D, ¶ 14; *see id.* ¶ 13.

In sum, the Court should deny summary judgment on FSEEE's requested prohibitory injunction because, among other reasons, genuine issues of material fact exist regarding the balance of hardships and the public interest.

27

## CONCLUSION

For the foregoing reasons, the Court should deny FSEEE's motion for summary judgment. The Court should set an evidentiary hearing to address an appropriate remedy for any Clean Water Act violations that FSEEE has standing to challenge.

Respectfully submitted this 17th day of February 2023.

TODD KIM
Assistant Attorney General

*s/ Alan D. Greenberg*
ALAN D. GREENBERG
Environmental Defense Section
United States Department of Justice
999 18th Street, Suite 370
Denver, Colorado  80202
Phone: (303) 844-1366
Email: alan.greenberg@usdoj.gov


JESSE A. LASLOVICH
United States Attorney

*/s/ John M. Newman*
Assistant U.S. Attorney
Attorney for United States

28

**CERTIFICATE OF COMPLIANCE WITH
WORD LIMITS**

This brief complies with the type-volume limitation of Local Rule 7.1(d)(2)

because this brief contains 6,492 words in a proportionally spaced font style,

excluding caption, certificate of compliance, table of contents and authorities,

signature block, and any certificate of service.  Microsoft Word for Microsoft 365

MSO (Version 2211 Build 16.0.15831.20220) 32-bit version computed the word

count.

<div style="margin-left:50%">

*s/ Alan D. Greenberg*
Alan D. Greenberg
Attorney for Respondents United
States Environmental Protection
Agency and Michael Regan

Dated:  February 17, 2023

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 17, 2023, I filed the foregoing Defendant's Response to Plaintiff's Motion for Summary Judgment using the CM/ECF system, which will send notification of such filing to counsel of record:

<u>*/s/ Alan D. Greenberg*</u>
ALAN D. GREENBERG