Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807-7051
406-721-1435
tim@bechtoldlaw.net

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | | |
|---|---|---|
| FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS, | ) ) ) | CV-22-168-M-DLC |
| Plaintiff, | ) ) ) | PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| vs. | ) ) | |
| UNITED STATES FOREST SERVICE, | ) ) ) | |
| Defendant. | ) ) ) | |

## Introduction

In this matter Plaintiff Forest Service Employees for Environmental Ethics (FSEEE) asks the Court both to declare that the Forest Service has been discharging retardant pollutants into waters of the United States without a permit and to enjoin the Forest Service from discharging retardant pollutants into waters of the United States without a permit. The Forest Service admits that it has been

1

discharging retardant pollutants into national forest waters of the United States without a permit and that it is now seeking a permit from the US EPA to discharge retardant pollutants. Thus, the Forest Service admits it is in violation of the Clean Water Act and this Court should grant FSEEE summary judgment on its Clean Water Act claim.

While admitting it is in violation of the Clean Water Act, the Forest Service is primarily concerned about the scope of an injunction during the expected two to three years that it will take to go through the permit process. The agency first argues that FSEEE does not have the requisite injury in fact for a widespread injunction. The agency then argues that it would have to completely cease the aerial application of retardants to prevent accidental discharges into waters of the United States and that this would be untenable. The Forest Service has not offered any options other than complete cessation of aerial retardant drops or business as usual. *See* Dkt#11 at 9-10. However, the "accidental" drops into water do not occur because aircraft doors pop open randomly midflight and spill retardant, the accidental drops into waters occur when an aircraft attempts to drop retardant on a certain area but overshoots or undershoots the target zone.

What the evidence from the last 12 years shows is that 300 feet is not a sufficient buffer to prevent these accidental discharges. The Forest Service could simply declare certain areas out-of-bounds for retardants, or expand the buffer

zone around waterways to 600 feet, as it has for certain imperiled species, so that the chances of getting too close to waterways are essentially removed.

Generally, it is not this Court's role to design how the Forest Service complies with the injunction FSEEE seeks against retardant discharges directly into water. The Court could simply enjoin the agency from discharging retardant into waters of the United States without a permit, and leave it to agency to decide how to comply with the Court's order. However, the Court could use its equitable powers of remedy here to expand the buffer zone around waters to 600 feet – a distance already enacted by the Forest Service to protect certain species – pending Forest Service acquisition of a NPDES permit from the EPA. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 310-320 (1982). Such an injunction would likely eliminate the "accidental" discharges of retardants into waters of the United States on national forests.

## Argument

### 1.  FSEEE has standing

The Forest Service argues that FSEEE has not shown concrete and particularized injury for the discharges of retardant into national forest waters other than Sespe Creek in the Los Padres National Forest. Dkt#11 at 2. "Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable

by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

FSEEE has provided the Declaration of FSEEE member George Wuerthner to establish standing and to show the particularized concrete harm to FSEEE's members of the continued drop of retardants into waters of the United States on national forests. *See* Dkt#18. Mr. Wuerthner has been to every western national forest in the United States, has seen retardant applied, and is harmed by the failure to have the safeguards of the Clean Water Act in place for retardant applications. Moreover, Mr. Wuerthner has declared his intentions to continue to visit the western national forests in the future. Dkt#18 ¶¶4-10. As the Forest Service acknowledges, *see* Dkt#11 at 11, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quotations omitted). Few individuals have such a wide-reaching personal and professional interest in fires in our nation's national forests as Mr. Wuerthner, who has authored numerous books on fire management and national forests. Dkt#18 ¶4. Mr. Wuerthner has declared the requisite concrete and particularized injury in fact necessary to establish FSEEE's standing.

### 2.  Injunction

FSEEE asks the Court to enjoin the Forest Service from dumping retardant pollutants into waters of the United States without a NPDES permit. As noted above, the Forest Service admits that it has no permit and has started the process of obtaining a permit. The Forest Service argues that an injunction is neither necessary nor proper here, first because FSEEE has not shown harm and because the public interest does not support an injunction.

> A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto*, 561 U.S. at 156-57 (quotations omitted).

Here, FSEEE has offered the declarations of George Wuerthner, Peter Deneen, and Mary Arkoosh to show the irreparable harm resulting from the Forest Service's application of retardant pollutants into waters of the United States. *See* Dkt#18, Dkt#16, Dkt#19, Dkt#4. Once retardant pollutant is discharged into waters of the United States, the harm cannot be undone. Mr. Deneen's and Mr. Wuerthner's harm is cognizable and concrete when the retardant is dumped into the waters on our national forests. *See, e.g.,* Dkt#18 ¶¶7-10. Dr. Arkoosh's declaration and research establish that accidental retardant discharges can be

acutely toxic to fish. Dkt#16 ¶¶4-6. Dr. Arkoosh's research also shows that retardant discharges can adversely affect salmon populations by harming the parr-to-smolt transition necessary to salmon survival in the ocean. *Id*. FSEEE has shown that the harm is irreparable.

Regarding the second factor, monetary damages and other remedies at law cannot rectify the harm. Injunctive relief is usually appropriate in environmental cases, such as this one, because "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (2007), *quoting Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). FSEEE has met the second factor.

Regarding the balance of hardships and the public interest factors, the Forest Service offers several declarations in an attempt to establish that the application of retardant pollution in waters of the United States is in the public interest, and that the balance of hardships must swing to the Forest Service to allow it to dump retardant as part of its fire management regime. *See* Dkt#12-2, Dkt#12-3.

The Forest Service's argument is essentially summed up by its assertion that FSEEE wants a "one size fits all" injunction that would "disregard the facts and circumstances of each discharge." Dkt#11 at 26. In the 2011 ROD, the Forest Service agreed that it would stay 300 feet away from waterways. This was a "one

size fits all" with the possible exceptions for emergency situations. The results from the past decade show that the 300-foot buffer is insufficient to prevent overshoots and undershoots of aerially-applied retardant discharges into water. The Forest Service argues that it must have the discretion to decide whether a retardant dump into water is the better option to protect the public interest, namely aquatic species and human safety. *Id.* at 25-27.

There are several problems with the agency's argument. The most important problem is that the Forest Service has no evidence that retardant actually works to deter the spread of fires. As explained by Andy Stahl, there is a negative correlation between retardant use and initial attack success on the national forests; that is, the more retardant used by a national forest, the lower its success in keeping fires small. Dkt#17 ¶7. Further, as Stahl explains, the Forest Service has admitted that it does not 'truly understand' and cannot make 'any valid conclusions' regarding the effectiveness of fire retardant in keeping fires small." Dkt#17 ¶8. Three-quarters of ignitions treated with retardant escape initial attack and grow larger than 300 acres. Dkt#17 ¶¶11-12. For fires larger than 300 acres, the Forest Service has no way of knowing whether use of retardant contributes in any way to the outcome of the fire. Dkt#17 ¶14.

Fire Ecologist Dr. Phil Higuera explains that the most recent data indicates that the area burned by wildfires in the West has doubled over the past four

decades due to increasingly warm, dry weather and climate conditions affecting most of the West. Dkt#20 ¶4. Wildfire-caused structure loss in the West has increased by over three-fold from the 1999-2009 decade to the 2010-2020 decade, out-pacing the increase in area burned over this same period, and nearly every Western state has seen higher structure loss rates. Dkt#20 ¶6. "This increase in structure losses has occurred notwithstanding significant increases in wildfire suppression spending and aerial retardant deployed. The disconnect between wildfire suppression efforts and structure loss is because most structure loss occurs under extreme conditions: high winds, with fire burning through very dry fuels. It is under these extreme conditions when fire suppression tactics are least effective, and in many cases not possible. For example, air tankers simply cannot fly during the periods of high wind. Under such extreme conditions, wildfires are more akin to earthquakes or hurricanes: efforts to stop them are largely futile." Dkt#20 ¶7.

Most wildfires in the West that resulted in structure loss were started from unintentional human-related ignitions. Further, homes typically ignite not by flames contacting structures, but by embers collecting and igniting home materials itself, be it roofing, siding, or dead vegetation accumulated in eaves and crevasses, so the most effective way to prevent structure loss is building structures with fire-resistant materials and design, and minimizing flammable vegetation on and near structures. Dkt#20 ¶¶8-9.

Brian Sexton's declaration, Dkt#12-5, offers an example of how the Forest Service's assumptions that applying retardant was critical to protecting human lives and structures were without basis. As Peter Deneen points out, Mr. Sexton got his facts wrong regarding the Sespe Creek fire. The only affected humans were removed before the retardant was applied, and the only structure theoretically at risk was Patton's Cabin, an unoccupied seasonal structure about one mile west of the fire's westernmost flank. Dkt#19 ¶¶2-4. The incident log itself notes "no structures threatened." Dkt#19-1 at 4.

The Forest Service argues that "[d]ischarges of fire retardant into waters occur as a consequence of the Forest Service's efforts to fight fires that can endanger human life and safety; can destroy private property, including homes and businesses; and can impact public lands, terrestrial animals, and other natural resources." Dkt#11 at 25. However, the empirical data show that retardant is only used on 5% of fires, use of retardant is only 25% effective at keeping fires under 300 acres, and retardant plays virtually no role in saving structures from fire. There does not appear to be any actual public benefit to allow the Forest Service to dump retardant pollutants into waters of the United States on national forests. Thus, the third and fourth factors militate for an injunction in this matter.

Reviewing courts have considered the scope and breadth injunctions in environmental cases similar to this case, and have consistently allowed district

courts to craft an injunction to fit the circumstances. *See, e.g., Weinberg*, 456 U.S. at 312.

> Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a nice adjustment and reconciliation between the competing claims. In such cases, the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.

*Weinberger*, 456 U.S. at 312 (quotations omitted).

The Forest Service is now in the process of obtaining a permit for retardant use. The evidence before the Court shows that 300 feet is an insufficient buffer to prevent "accidental" discharges to waters of the United States. The Forest Service already requires a 600-foot buffer in certain circumstances to prevent harm to species. *See* Dkt#17-3 at 3. FSEEE asks this Court to use its flexible equitable powers to require the Forest Service to implement a 600-foot buffer around national forest waterbodies during the pendency of the agency's application for a Clean Water Act permit. The extended buffer should allow aircraft an extra measure of leeway from "accidental" discharges into waters of the United States.

/

/

**Conclusion**

The Forest Service admits that it is dumping retardant into navigable waters without an NPDES permit, and it is now going through the process of obtaining a permit from the US EPA. FSEEE asks this Court to grant summary judgment in favor of FSEEE and enjoin the Forest Service from dumping retardant within 600 feet of waterbodies on national forests until it has an NPDES permit.


DATED this 9th day of March, 2023.

/s/ Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC


Attorney for FSEEE

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1, I certify that the foregoing document contains 2271 words, and that a table of contents, table of authorities, and an index of exhibits are not required for this brief.

/s/Timothy M. Bechtold