IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES FOREST SERVICE,<br><br>Defendant. | CV 22–168–M–DLC<br><br>ORDER |

Before the Court is Plaintiff Forest Service Employees for Environmental Ethics' ("FSEEE") Motion for Summary Judgment. (Doc. 6.)  On April 24, 2023, the Court held a hearing on this matter. (*See* Doc. 43.)  For the following reasons, the Court grants in part and denies in part the motion for summary judgment.

## Background

FSEEE brings this action, pursuant to 33 U.S.C. § 1365(a), challenging the United States Forest Service's ("USFS") discharge of aerially deployed fire retardant into navigable waters of the United States without a National Pollutant Discharge Elimination System ("NPDES") permit, in violation of the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.* (Doc. 1 at 1.)  FSEEE alleges that such discharges have occurred on "at least 459 occasions" between 2012 and 2019, "totaling 761,282.5 gallons" of retardant. (*Id.* at 5.)  FSEEE seeks a declaratory

1

judgment against the USFS and to enjoin the USFS from the aerial application of fire retardants unless and until it obtains an NPDES permit to do so. (*Id.* at 9–10; *see also* Doc. 7 at 8, 9.) FSEEE has moved for summary judgment, (Doc. 6), which the USFS opposes, (Doc. 11).

## Discussion

This Court can resolve an issue summarily if "there is no genuine dispute as to any material fact" and the prevailing party is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party. *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### I.   Standing

In order to satisfy the case or controversy requirement of Article III, a plaintiff must establish standing to bring a claim. *Summers v. Earth Island Inst.*, 555 U.S. 488, 491 (2009). An organizational plaintiff has standing to sue if its members would have standing to sue in their own right, the "interests at stake are germane to the organization's purposes," and the members' participation is not

necessary to the claim or the relief requested. *Friends of the Earth, Inc. v. Laidlaw Envtl. Srvcs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Three elements are essential to member standing: injury in fact, causation, and redressability. An "injury in fact" must be (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical." *Summers*, 555 U.S. at 493 (citation omitted). An organization must show, through specific facts, FED. R. CIV. P. 56(e), that at least one member has concrete and personal interests in a specific area of the environment that is affected by the challenged government action and that the member's interests have been and will be directly harmed by the government action. *Summers*, 555 U.S. at 494–98. Additionally, the injury must be "fairly traceable to the challenged action" and likely to be redressed by a favorable decision. *Id.*

"[E]nivronmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values will be lessened' by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Where the alleged injury is said to occur over expansive areas, such as an entire state or region, it may be sufficient for plaintiffs to establish that they have been, or will be, adversely affected in a smaller subset of areas that are representative of the whole. *See Defenders of Wildlife v. EPA*, 420 F.3d 946, 950, 957 (9th Cir. 2005)

(holding that, where the challenged action involved impacts to endangered species habitat throughout the state of Arizona, injury in fact was established by declarations of individuals that mentioned specific subareas within the state where particular listed species may be effect); *see also Alaska Center for the Environment v. Browner*, 20 F.3d 981, 985 (9th Cir. 1994) (holding that, where the challenged action involved the waters of Alaska, injury in fact was established by declarations regarding "a representative number of waters throughout the state"); *Center for Biological Diversity v. EPA*, 90 F. Supp. 3d 1177, 1181, 1188 (W.D. Wash. 2015) (holding that, where the challenged action involved the coastal and estuarine waters of Washington and Oregon, injury in fact was established by the declarations of individuals who averred that they regularly visited a representative number of the states' coastlines and estuaries).

    The USFS contends that FSEEE lacks standing "to enforce the alleged statutory violations other than those pertaining to Sespe Creek in California." (Doc. 11 at 15.) FSEEE submitted the declarations of members Peter Dineen, (Doc. 4), and George Wuerthner, (Doc. 18),[1] in order to establish standing. Mr. Dineen asserts his use and enjoyment of Sespe Creek, near his home in Ojai, California, has been harmed by discharges of fire retardant into the creek during

---

[1] The declaration of Mr. Wuerthner was provided in response to the argument raised by the USFS in its response to the Motion for Summary Judgment. The Court denied the USFS's Motion for Leave to File Surreply (Doc. 26) on the issue after determining "a surreply would [not] aid in its understanding of the issues and the parties' arguments." (Doc. 30 at 10.)

fires in October 2022 and the threat of future discharges into the creek. (Doc. 4 at 2–4.) Mr. Wuerthner asserts that his "use and enjoyment of national forests and their waters" is harmed by the challenged action. (Doc. 18 at 1.) Mr. Wuerthner goes on to explain his extensive travels throughout the western region—including to "every western national forest and BLM district"—and how his work centers around public lands. (*Id.* at 2–3.) He also states that he has planned visits to national forests in Oregon, California, Montana, Idaho, Wyoming, Colorado, Nevada, Arizona, New Mexico, and Alaska over the course of the next two years. (*Id.* at 4.) He concludes that the challenged action threatens his "use of water during [his] frequent, on-going, and future visits to fire-affected national forests." (*Id.* at 6.)

The Court finds that FSEEE has established standing through these member declarations. First, FSEEE challenges the USFS's failure to obtain an NPDES for any and all discharges of aerially deployed fire retardant into waters protected by the CWA; thus, their claim encompasses more than individual instances. Second, both declarants aver that they are persons for whom the aesthetic and recreational values will be lessened by the challenged action. Mr. Dineen focusses specifically on Sespe Creek in California while Mr. Wuerthner addresses areas in Oregon, California, Montana, Idaho, Wyoming, Colorado, Nevada, Arizona, New Mexico, and Alaska. As the Ninth Circuit has explained

"alleging an injury-in-fact covering large areas . . . simply reflects the relatively broad nature of the potential harm." *Defenders of Wildlife*, 420 F.3d at 957. The challenged action here involves water subject to CWA protection throughout all ten of these states where aerially deployed fire retardant may be deployed. The Court is satisfied that those areas identified in Mr. Dineen and Mr. Wuerthner's declarations are sufficiently representative of the entire area that is potentially affected. However, FSEEE has not provided a sufficient basis to establish standing outside of the ten western states identified in Mr. Wuerthner's declaration.

Moreover, FSEEE only provided the requisite notice of intent to sue ("NOI") to these same ten western states. (*See* Doc. 33 at 87–88). The Clean Water Act's citizen suit provision requires would-be plaintiffs to provide 60-days' notice of an alleged violation to the EPA Administrator and "to the State in which the alleged violation occurs" before filing a lawsuit. 33 U.S.C. § 1365(b)(1)(A). Failure to provide sufficient notice must result in dismissal of the action for lack of subject matter jurisdiction. *See Wash. Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1354 (9th Cir. 1995) (citing *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989)) (holding that the CWA's notice requirement is mandatory). Accordingly, the geographic scope of this action is limited to the states of Oregon, California, Montana, Idaho, Wyoming, Colorado, Nevada, Arizona, New Mexico, and Alaska.

The USFS does not challenge either of the remaining standing factors and

fully concedes their existence with respect to Sespe Creek. Given the further concessions from the USFS that these discharges have occurred, (Doc. 5 ¶ 6), are likely to occur in the future, (*id.* ¶ 15), and that the discharges into Sespe Creek violate the CWA, (Doc. 11 at 6), the Court is satisfied that both causation and redressability have been established.

Accordingly, the Court concludes that FSEEE has standing to enforce the alleged CWA violations in Oregon, California, Montana, Idaho, Wyoming, Colorado, Nevada, Arizona, New Mexico, and Alaska.

## II.   Declaratory Judgment

FSEEE seeks a declaratory judgment that "the Forest Service's continuous, on-going, and unpermitted discharges of retardant pollutants into waterways from aircraft point sources violate the CWA." (Doc. 1 at 9.)

The CWA prohibits the discharge of any pollutant from a point source into navigable waters of the United States unless permitted by the EPA Administrator through an NPDES permit. *See* 33 U.S.C. §§ 1311(a), 1342(a), 1362(12)(A). The term "pollutant" means "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). At least in the context of NPDES permitting for stormwater discharges,

the EPA has recognized "phosphorous and nitrogen from fertilizer" as "pollutants" because "[t]hese materials can be toxic to aquatic organisms and degrade water for drinking and water-contact recreation." National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47990, 48033–34 (Nov. 16, 1990) (codified at 40 C.F.R. § 122, 123, 123); *see also NRDC v. EPA*, 526 F.3d 591, 597 (9th Cir. 2008) (discussing same). A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14)

There does not appear to be any genuine dispute that the USFS's discharge of aerially deployed fire retardant into waters of the United States without an NPDES permit violates the CWA. The USFS concedes that "in certain circumstances an aircraft can be a point source." (Doc. 5 ¶ 14). This is also consistent with the CWA's definition of a point source—i.e., a "discernable, confined and discrete conveyance." Although the USFS denies that fire retardant is a pollutant in their Answer, (*see id.* ¶ 13), the USFS later acknowledges "that discharges of fire retardant to Sespe Creek without a Clean Water Act permit are unlawful," (Doc. 11 at 6). Thus, it appears that the USFS is willing to concede that fire retardant is a pollutant. This is further supported by the USFS's

acknowledgment that "[a]erially delivered fire retardant formulations currently in use are primarily inorganic fertilizers (ammonium phosphates) or other inorganic salts (magnesium chloride)," (*see* Doc. 5 ¶ 28), and that the direct effects of fire retardant entering a waterway "could include, in certain circumstances, lethal and sub-lethal effects in aquatic species," (*id.* ¶ 34).

Finally, the USFS admits that "in certain circumstances, the Forest Service has discharged aerial fire retardant into navigable waters in this Division without a[n] [NPDES] permit." (*Id.* ¶ 6.) The USFS also acknowledges that in the future it may again discharge fire retardant from aircraft into navigable waters without an NPDES permit. (*Id.* ¶ 15.) And, in fact, the USFS has already begun the process of obtaining a general NPDES permit from the EPA to permit its discharge of aerially deployed fire retardant into waters of the United States. (*See* Doc. 12 at 10–11.)

The only factual dispute remaining pertains to the number of alleged past discharges. FSEEE claims that there have been at least 459 intrusions into waterways between 2012 and 2019. (Docs. 1 at 8, 7 at 3.) The USFS counters that not all 459 recorded "intrusions" were into navigable waters, and that the actual number of recorded drops into navigable waters is 213. (Doc. 12 at 5; *see also* Doc. 12-4 at 7.) At the hearing on the motion for summary judgment, FSEEE clarified that it is requesting declaratory judgment as to *past, present, and future*

*violations*. However, the Court does not find the actual number of past discharges to be a material fact because the challenged action is the USFS's failure to obtain an NPDES permit for *any* discharge of fire retardant into waters of the United States.

If any doubt remains that the challenged action violates the CWA, these doubts are dispelled by the fact that the USFS conceded at the hearing on April 24, 2023, that there are no factual disputes relating to future discharges of fire retardant into waters of the United States that are not covered by a permit. Accordingly, the Court concludes that FSEEE has met its burden of demonstrating that there is no genuine issue of material fact regarding the claim for declaratory judgment.

### III.   Injunctive Relief

FSEEE seeks "injunctive relief to compel the Forest Service to comply with applicable environmental statutes, prevent irreparable harm, and satisfy the public interest." (Doc. 1 at 10.) In other words, FSEEE requests that this Court enjoin the USFS from discharging fire retardant into waters of the U.S. in violation of the CWA and leave it to the USFS to determine how best to achieve this objective.

To obtain a permanent injunction, the moving party must demonstrate:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that

the public interest would not be disserved by a permanent injunction. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010); *see also N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007). FSEEE has failed to meet its burden under this analysis.

The only evidence of "irreparable harm" offered by FSEEE is found in the aforementioned declarations of two of FSEEE's members, (Docs. 4, 18), and the declaration of Mary Akoosh, (Doc. 16). Ms. Akoosh is a microbiologist and immunologist who previously worked with NOAA's Northwest Fisheries Science Center Environmental and Fisheries Sciences Division. (*Id.* at 1.) Her declaration spoke to her research on the impacts of aerial fire retardant on salmon. (*Id.*) Ms. Akoosh's research concluded that "accidental [fire retardant] drops during salmon outmigration would have adverse impacts that extend beyond acute mortality that occurs within the immediate drop and dilution areas." (*Id.* at 2.) The USFS admits that "if fire retardant enters a waterway, direct effects could include, in certain circumstances, lethal and sub-lethal effects on aquatic species," including "mortality of organisms, change in abundance and composition of aquatic communities, or adverse impact to habitat." (Doc. 12 at 8.) However, the USFS does not concede that harm will occur as a result of every discharge or that any harm is irreparable. In fact, the USFS has provided evidence that "lethal intrusions [of retardant] are expected to be extremely rare and the majority of effects, if any

11

occur, are assumed to be sub-lethal or indirect." (Doc. 12-4 at 11.)

Even assuming FSEEE has demonstrated irreparable harm and that other legal remedies are not sufficient, *see Northern Cheyenne Tribe*, 503 F.3d at 843 (explaining that "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable"), FSEEE has not met its burden on the remaining two factors to warrant the entry of a permanent injunction.

FSEEE has not offered sufficient evidence on the hardships to the parties and has failed to demonstrate that the public interest would not be disserved by a permanent injunction.  The USFS explains that the 213 recorded intrusions only occurred where it was necessary "to protect human life or public safety (23 intrusions) or due to accident (190 intrusions)." (Doc. 12 at 9.)  Although the injunction would presumably allow the USFS to continue to aerially deploy fire retardant, it is unclear how the agency would proceed or if the agency could completely avoid future CWA violations.  Thus, the requested injunction could conceivably result in greater harm from wildfires—including to human life and property and to the environment—by preventing the USFS from effectively utilizing one of its fire fighting tools.

Although FSEEE claims that fire retardant is an ineffective tool in fighting wildfires, (Doc. 24 at 9), this fact is disputed, (*see* Docs. 8-1, 8-2).  Additionally,

although FSEEE has presented possible solutions that would allow continued use of retardant while reducing accidental discharges, such as a 600-foot buffer requirement, (Doc. 24 at 10), it has failed to demonstrate that such solutions would actually be effective from either parties' perspective. Moreover, FSEEE has not addressed how the injunction would be enforced, which would itself create a significant burden for both parties.

Moreover, the CWA does not require a district court to enjoin all violations of the CWA's permit requirements. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). In *Romero-Barcelo*, a district court declined to enjoin the U.S. Navy from discharging pollutants into waters of the U.S. without an NPDES permit but ordered the Navy to apply for a permit. *Id.* at 306. The First Circuit Court of Appeals held that the Federal Water Pollution Control Act ("FWPCA") withdrew the district court's equitable discretion on this issue and reversed the district court's decision.[2] *Id.* The Supreme Court reversed and remanded for review under an abuse of discretion standard. *Id.*

The Supreme Court explained that the "grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically

---

[2] The FWPCA was enacted in 1948 and later became known as the CWA following major amendments in 1972. *History of the Clean Water Act*, EPA, https://www.epa.gov/laws-regulations/history-clean-water-act (July 6, 2022).

obligated to grant an injunction for every violation of law." *Id.* at 313. The court went on to state that "[t]he District Court did not face a situation in which a permit would very likely not issue, and the requirements and objective of the statute could therefore not be vindicated if discharges were permitted to continue." *Id.* at 320. However, "[s]hould it become clear that no permit will be issued and that compliance with the FWPCA will not be forthcoming, the statutory scheme and purpose would require the court to reconsider the balance it has struck." *Id.*

Here, the USFS represents that it has begun the process of obtaining "a general NPDES permit from EPA and the 47 States authorized to implement the NPDES program in its jurisdiction." (Doc. 12 at 10.) The estimated timeframe for obtaining the permit is two and a half years. (*Id.* at 11.) In the meantime, the USFS and EPA have "entered into a Federal Facility Compliance Agreement," which requires the USFS to obtain the general NPDES permit but allows the continued aerial deployment of fire retardant pursuant to the USFS's 2011 Record of Decision until such permit is obtained. (*Id.* at 13–14.) Thus, as the court recognized in *Romero-Barcelo*, the objective of the CWA is likely to be achieved here in due course without need for a permanent injunction in the interim.

Accordingly, IT IS ORDERED that FSEEE's Motion for Summary Judgment (Doc. 6) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that the USFS's unpermitted aerial discharges

of fire retardant into navigable waters of the United States in the states of Oregon, California, Montana, Idaho, Wyoming, Colorado, Nevada, Arizona, New Mexico, and Alaska is in violation of the Clean Water Act.

IT IS FURTHER ORDERED that the USFS is not enjoined from utilizing the aerial deployment of fire retardant as a tool to fight wildfires.

IT IS FURTHER ORDERED that the USFS shall provide this Court with a status report every six-months regarding its progress toward obtaining an NPDES permit until a final decision has been reached as to the issuance of said permit.

DATED this 26th day of May, 2023.

Dana L. Christensen, District Judge
United States District Court